United States District Court

Western District of Tennessee-Eastern Division

RECEIVED BY
OCT 14 2020
Thomas M. Gould, Clerk
U.S. District Court
W.D. OF TN, Jackson

John F. (Jef) Curran III, Plaintiff

v.  Case:

Wepfer Marine, Inc.,

Okie Moore Diving and Marine Salvage, Co.

Western Rivers Boat Management, Inc.

## Claim for Marine Salvage Compensation

The Plaintiff, John F. Curran, seeks reasonable compensation for the salvor services provided to the Defendants which were outside the scope of professional services the Plaintiff was hired to perform for the Wepfer Marine, Inc. (Wepfer) subsidiary, Okie Moore Diving and Marine Salvage, Co. (Okie Moore).

## Statement of Jurisdiction

This Court has jurisdiction to hear the claims set forth herein. The Judiciary Act of 1789 and Article III §2 of the United States Constitution plainly defines that the Federal District Courts has exclusive original jurisdiction in civil cases in admiralty and maritime matters. The subject matter of the case is plainly admiralty and maritime law, which is exclusive of state jurisdiction.

The parties in this matter are both located within the Western District of Tennessee. The Plaintiff resides in Bath Springs, TN. The Defendants, Wepfer Marine, Inc. and its subsidiary, Okie Moore Diving and Marine Salvage, Co. are home ported in Memphis, TN. Although there is no diversity in this matter,

this Court serves the same location of the parties. Additionally the waterway where the salvage occurred by the Plaintiff was in the inland waterway of the United States which sees significant foreign vessel traffic and is subject to the admiralty and maritime laws

The amount in dispute exceeds $75,000, the threshold for civil matters to be heard in federal matters.

The salvor services provided to the Defendants, by the Plaintiff were provided in January 2019. This claim is made within 24 months of the services being rendered in accordance with 46 U.S.C. § 80107(c).

This honorable Court has jurisdiction to hear this matter.

### Factual History

The Plaintiff offers the following as the factual basis of the events that occurred regarding the professional services provided by the Plaintiff to the Defendants, beyond the scope of the Plaintiff's employment.

1. The Plaintiff was hired by Okie Moore on, or about, 16 January 2019 to serve as a salvor aboard the Stephen Foster. The functions were to include salvor, diver, equipment operator, welder and laborer.
2. The Plaintiff's first assignment for Okie Moore was to be a part of the salvage effort of a hopper barge owned by Western Rivers at, or near Greenville, MS on the Mississippi River on, or about 16 January 2019.
3. The Western Rivers Boat Management, Inc. barge was successfully raised and the salvage equipment of Okie Moore was being transported back to its staging area by Western Rivers in accordance with the salvage contract by and between Okie Moore and Western Rivers.
4. The Okie Moore equipment was in tow with additional barges of Western Rivers during the transit back to the Okie Moore staging area located in Calvert City, KY.
5. During the return transit the salvage crew of Okie Moore was instructed to assist the crew of the Western Rivers vessel to "break tow" which was a combination of Western Rivers barges and the salvage equipment barges of Okie Moore at the junction of the Upper Mississippi and Ohio

Rivers. The Plaintiff and Mitch Revette, employees of Okie Moore, proceeded to the deck of a Western Rivers barge.

6. The Plaintiff and Mitch Revette were instructed to release cables holding the various barges together while previously underway. Mitch Revette attempted to release the tension on a deck winch when the handle of the winch, under tension, released immediately and struck Mitch Revette in the head. It was later confirmed Mitch Revette suffered a complete skull fracture as a result.
7. The Plaintiff, a former US military special operations corpsman with the United States Navy, begin immediate trauma care to Mitch Revette. The medical equipment onboard the Stephen Foster consisted of a first aid kit. No equipment was accessed on the Western Rivers vessel.
8. Care was rendered to Mitch Revette immediately by the Plaintiff.
9. Once onboard the Stephen Foster the Plaintiff recognized that Mitch Revette did not have pupils which were equal and reactive to light. One pupil was dilated and not reactive, indicative of a head injury, most likely a skull fracture-either closed or open.
10. The Plaintiff instructed the vessel Master, Bruce Gibson, that Mitch Revette needed to be transported immediately to a medical facility.
11. Bruce Gibson radioed the US Coast Guard and made the arrangements for an ambulance to meet the Plaintiff and Mitch Revette at the Lock and Dam No. 53 near Cairo, IL.
12. The Plaintiff informed the ambulance crew of the suspected skull trauma of Mitch Revette and the crew acknowledged the suspicion.
13. It was later confirmed to the Plaintiff that Mitch Revette did indeed have a skull fracture
14. Mitch Revette was back to full duty within 12 weeks, ie 3 months, after the injury.
15. The Plaintiff, and his immediate care, was recognized by the senior management at Wepfer Marine as being the reason Mitch Revette returned to work so quickly.
16. The senior management of Wepfer Marine thanked the Plaintiff for his life saving efforts.
17. The Plaintiff was then instructed to prepare a medical equipment list for the Stephen Foster and was assigned additional duties as a safety officer for Okie Moore.
18. Such proposed medical equipment list was fulfilled not only for the Stephen Foster to cover the Okie Moore fleet, but replicated for the Wepfer fleet.
19. Such additional duties did not come with an increase in pay.
20.

## **Argument**

It goes without saying that the rapid intervention of trauma care by the Plaintiff dramatically lessened the long term effects of injury to Revette and thereby greatly reduced his recovery time. Wepfer senior management recognized such efforts and the savings in costs to the Wepfer fleet.

The National Institute of Health (NIH) has published studies showing that skull fracture care and treatment can take up to 6 years after the incident before the patient is able to return to a 'normal' life. The NIH plainly states that the quicker intervening care can be delivered to the patient the treatment and recovery time is reduced accordingly. Revette returned to full duty within 12 weeks of the incident, some time in April 2019.

The NIH, via its US National Library of Medicine, has further published that the costs of head injuries include both the acute phase (direct in hospital costs) and the rehabilitation services which includes extended care, disability and lost income.

The average costs of the acute phase-the direct care phase is $724,113, for reported data from 1994. Costs have most likely increased since 1994.

The average costs for the follow-on, or rehabilitative services averaged $6, 338,472, also based upon 1994 data.

The immediate trauma care provided by the Plaintiff to Revette resulted in direct savings to the Defendants, in 1994 dollars, by as much as $7,062,585 and equivalent amount of $12,359,523.75 in today's dollars.

With its origins in antiquity, the basis of salvage is that a person helping another at sea is putting himself and his vessel at risk and should be appropriately rewarded. A related consideration was to prevent piracy, since any vessel in peril might well be abandoned to pirates if the owner did not reward an honest salvor. Salvage law has been recognized for centuries in such documents as the edicts of

Rhodes and the Roman Digest of Justinian. It is still a nearly universally recognized right, though conditions for awards of salvage vary from country to country.

The right to be rewarded for salvage at sea is based both on principles of fairness and public policy; The law seeks to be fair both to the property owners and to the salvors. The legal entitlement to a salvage reward arises when a person, acting as a volunteer (that is, without any pre-existing contractual or other legal duty so to act) preserves or contributes so to preserving at sea any vessel, cargo, freight, or other recognized subject of salvage from danger.

A salvage situation arises when a shipowner accepts an offer of help from a salvor. To that extent, the arrangement is contractual, but it is not a contract for services with a pre-arranged fee. Instead, the law provides that after the service is done a court or arbitrator will make an award taking into account:

- the degree of success of the salvage venture
- the degree of danger of the salvage venture
- the value of the property salved
- whether a reasonable attempt to protect the coastal environment was made
- the provisions of Articles 13 & 14 of the Salvage Convention 1989.

A formal contract is not strictly necessary, provided there is evidence that the owner has acquiesced in the salvor's intervention. The assumption here is that when faced with the loss of his vessel and cargo, a reasonable prudent owner would have accepted salvage terms offered, even if time did not permit such negotiations. Even so, the shipowner is entitled to reject any offer of help, and would do so if the shipping line had already made arrangements with a professional salvor of their choice. The Okie Moore master did not have a preferred relationship with ANY provider of emergency trauma care at the time the Plaintiff rendered the services beyond the scope of his original employment.

### *Recognized subject matter*

Traditionally, salvage only recognizes a ship or craft ("vessel"), cargo on board, freight payable, and bunkers carried on board as the subject of property in danger. The expansion of 'traditional' is required in the instant matter as the services provided by the Plaintiff

The scope of salvage has been expanded by the 1989 Salvage Convention, and protection of the environment is part of salvage. Oil pollution can cause damage to the environment. If the salvor prevents oil pollution from happening, he indeed performs a valuable service to the community as mentioned by (1997) 1 Lloyd's Rep 323 (HL), pp 326–28. Therefore, the salvor will be rewarded with special compensation, i.e., *liability salvage* instead of *property salvage*.

The Convention does not consider saving lives to be part of salvage, but if one vessel saves life and the other saves property, the arbitrator may apportion the salvage reward between them as he thinks fit thereby identifying professional services rendered for trauma care which directly reduces the loss to the vessel or fleet owners.

In the instant matter the assets saved were those of Wepfer and Western Rivers. The responsibility of the Plaintiff to Okie Moore remained and the fleet of assets of Okie Moore were protected by his actions. The peril does not need to be immediate as the costs of the acute care delivery and the rehabilitative services would be borne by Wepfer and Western Rivers, long term and the costs associated would have reasonable affected the fleets of these 2 Defendants. The Plaintiff's voluntary actions directly resulted in savings to each of these 2 Defendants.

### *Real peril*

Danger needs to be real but not necessarily immediate or absolute. The subject of salvage must be in real danger, which means the property is exposed to damage or destruction.

The burden of proof lies on the salvor, which means the salvor needs to prove real danger existed when the performance of service commenced. The court or arbitrators must determine whether the property was truly in danger. As every situation differs, both subjective and objective tests will be conducted. Common considerations are:

   a. Would a reasonable Master of the vessel in distress have answered *yes* or *no* to the offer of assistance?
   b. Was there a real apprehension of danger even though that danger may not have been absolute or immediate?
   c. Was the danger fanciful or so remote as only to be a distant possibility?

It is incumbent upon the court to assess the existence and level of danger, both present and future. The case of the *Troilus* (1951 1 Lloyd's Rep. 467, HL) illustrated the concept of future danger that the court must take into account when determining the existence of danger. In this particular case, the cargo owners contended that the ship was in perfect safety when she reached Aden, and therefore it constituted ocean towage but not salvage when towing from Aden to UK. The court held that even though the ship and cargo was in physical safety, the services rendered still amounted to salvage service on the grounds that the master of a damaged ship must do his best to preserve the ship and cargo and bring them to their destination as cheaply and efficiently as possible. The salvage award was reasonable as long as the master acts reasonably for the combined benefit of ship and cargo.

In the modern world, the dispute normally is not about whether there is just the existence of danger, but also the degree of danger, as it determines the extent of the award. The degree of danger in the instant matter is significant to both Wepfer and Western Rivers had the costs associated with the care been the responsibility of each.

### *Voluntary service*

*Voluntary* means that the services are not rendered under a pre-existing contract agreement or under official duty or purely for the self-preservation interests of the salvor. Because of this, there is no limitation to the class of persons that can be considered as volunteers.

The professional services, had they not be rendered by the Plaintiff would have lkeft the fleets of both Wepfer and Western Rivers in peril as the savings in health care-both direct and rehabilitative, as well as the reduction in lost wages to Revette, etc. is the very definition of salvage, albeit nonstandard. Had the Plaintiff NOT provided those services both Wepfer and Western Rivers would have had to spend those monies, in excess of $12 million dollars, for Revette's care and thereby increasing the peril of each's fleets of vessels, the very definition of a salvage claim.

A pre-existing agreement refers to any agreement entered into before the time of the existence of danger. It includes ship's master and crew who have pre-existing employment agreement with ship-owners. They have the duty to preserve the ship and cargo, and therefore they cannot convert themselves into salvors in the event of trouble.

Notwithstanding, exceptions still exist in this area. Salvage can still be rendered if the pilot or crews of the ship in peril rendered service outside or beyond the scope of their duties under the contract. The case of the *Sandefjord* (1953 2 Lloyd's Rep. 557) held that the pilot brought his personal knowledge of the local conditions and his seafaring skills to bear when faced with a grounding. Moreover, the pilot relieved the ship owner of paying a vast salvage award for tug assistance. Under these conditions, the pilot was entitled to a salvage award. The Plaintiff offered these services voluntarily and the services provided were not what the Plaintiff was hired to perform for Okie Moore.

### Conclusion

The Plaintiff provided professional services to Okie Moore that resulted in the reduction of real, future peril to the fleets of Wepfer and Western Rivers by the significant reduction of money that would have been spent on the care to be received by Revette. The Plaintiff is entitled to a salvage award of 33% of the potential monies saved for an award of $4,078,642.

Respectfully submitted,

*John F. Curran III* (signature)

John F. Curran III, Pro se

P.O. Box 1783
Savannah, TN 38372
731-458-7111

### Certificate of Service

An original copy of the claim has been served upon all Defendants of this action by third party process server.

*John F. Curran III* (signature)

John F. Curran III, Pro se